387 So.2d 578 (1980)
STATE of Louisiana
v.
Cody DENTON et al., on behalf of David Johnson and Jack Hutchinson.
STATE of Louisiana
v.
Cody DENTON et al.
Nos. 65468, 66438.
Supreme Court of Louisiana.
June 23, 1980.
Rehearings Denied September 12, 1980.
*579 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Francis Dugas, Dist. Atty., Sidney A. Ordoyne, Jr., Asst. Dist. Atty., for plaintiff-appellee-respondent.
James A. Wood, Gerald A. McGill, Nathan E. Eden, Leslie J. Clement, Jr., Thibadaux, Macrino Trelles, Baton Rouge, for defendants-appellants-relators.
MARCUS, Justice.
This is an appeal by certain defendants from their convictions and sentences resulting from the entry of guilty pleas and a trial by jury.[1] The primary issue in all the *580 appeals is whether the trial judge erred in denying their joint motion to suppress a large quantity of marijuana (38,500 pounds) seized from the eighteen-wheel and ten-wheel tractor trailers and a shrimp boat, MR. PETER, during the course of an unloading operation at the Bayou Fish Company located on the bank of Bayou Lafourche in Lafourche Parish, Louisiana. The argument is that the evidence was obtained as a result of unconstitutional searches and seizures.
We have reviewed the record and find that the trial judge accurately set forth in his per curiam comments the facts as they relate to the searches and seizures. Accordingly, we adopt the following statements of facts as our own:
On August 13, 1978, agents of the United States Customs Service and the Louisiana State Police boarded the abandoned vessel, LADY DOLLY, in the Gulf of Mexico west of Marsh Island below Morgan City, Louisiana. Approximately ten tons of marijuana was [sic] found in the hold of the vessel and seized. Subsequently, eight persons were found on an old oil rig approximately one quarter of a mile from where the LADY DOLLY was seized. No evidence was introduced to connect these individuals with the LADY DOLLY.
Two of these eight individuals were David Johnson and Cody Denton. Subsequent investigation revealed that they were connected with the Bayou Fish Company operating out of Leeville in the Parish of Lafourche, Louisiana.
On August 20, 1978, Sergeant Mark Zeringue, a narcotics officer with the Louisiana State Police, met with United States Customs agents and Federal Drug Enforcement agents concerning information that they possessed about a smuggling transaction that would be taking place in several days at the Bayou Fish Company. The evidence does not reveal the source of this information nor the facts upon which this information is based. As a result of this meeting, agents of the United States Customs Service, the Drug Enforcement Agency and the Louisiana State Police set up a twenty-four hour off-premises surveillance of the Bayou Fish Company.
The Bayou Fish Company is located on the right or west descending bank of Bayou Lafourche between La. Hwy. 1 and the waters edge (locally known as the batture) approximately two and a half to three miles north of the Leeville bridge in the Leeville Community in the southern part of the Parish of Lafourche, Louisiana.[2] On these premises are located a wharf, fish house, loading dock, small office, parking area, freezer, and house. Off-premises surveillance of this property continued for the next seven days with the officers noting the routines and patterns of business operations and vehicular traffic.
On the evening of Saturday, August 26, 1978, all but one of the lights of the fish house were turned off at approximately 10:00 o'clock p. m.[3] Between approximately 9:30 p. m. on August 26, 1978 and 12:30 a. m. on August 27, 1978, small *581 groups of individuals arrived on the premises at different times until there were approximately eleven to fourteen persons present. Cody L. Denton and David Johnson were identified as two of the parties present. The police officers divided into different teams to observe the activities of the fish house from various positions off of the premises.
Between 10:15 p. m. on August 26, 1978 and 1:30 a. m. on August 27, 1978, a white Ford Thunderbird was observed leaving the Bayou Fish Company premises and returning on several occasions. The vehicle would leave the premises and travel south on La. Hwy. 1 at a high rate of speed to a point south of the Leeville bridge and return.
At approximately 1:00 o'clock a. m. on Sunday, August 27, 1978, Sergeant Paul Trahan of the Louisiana State Police observed the shrimp boat, MISS EVERGLADES, towing the shrimp boat, MR. PETER, in a northerly direction in Bayou Lafourche near the Fagan Enterprises dock south of the Leeville bridge. At 1:38 a. m. on August 27, 1978, the MISS EVERGLADES and MR. PETER docked at the wharf on the Bayou Fish Company premises. An eighteen wheel and a ten wheel tractor and trailer were observed parked on the premises with their backends against the loading dock of the fish shed.
Subsequently, Sergeant Mark Zeringue and Sergeant Paul Trahan of the Louisiana State Police, were driven to a service station located on the bayou side, south of the Bayou Fish Company across La. Hwy. 1 from Boudreaux's Motel. They then proceeded on foot in a northerly direction and established an observation post under the back porch of John Boudreaux's residence which is the first property south of the Bayou Fish Company. The back porch of John Boudreaux's home is on pilings and is located approximately one hundred feet from the south side of the small office, fish house and wharf on the Bayou Fish Company property.
At approximately 2:55 or 3:00 o'clock a. m. on August 27, 1978, the ten wheel truck and trailer which had been parked at the fish house was observed to leave.
Using a night scope, Sergeant Trahan commenced observations of the activities taking place on the Bayou Fish Company property. Both Sergeants Zeringue and Trahan heard voices but were unable to distinguish words and heard bumping sounds made by cargo being moved. The window and door on the south side of the fish shed were open. There was a six to eight foot gap between the side wall of the fish house and the parking lot end of the loading dock of the fish shed. See State Exhibits 3, 4, and 5. The court made an optic inspection of the south side of the Bayou Fish Company property from the places where Sergeant Trahan made his observations on the night in question. This inspection confirmed that Sergeant Trahan had a clear field of vision from about one hundred feet and that the physical layout of the premises was as he described.
Through the night scope, Sergeant Trahan observed people carrying bales of marijuana from the direction of the MR. PETER through the fish shed across the loading dock and into the eighteen wheel truck.[4] On two previous investigations, Sergeant Trahan had observed similar offloading operations involving trucks and vessels and on a previous occasion had witnessed a loading operation at a farm house. Some of the individuals had head lumps (bull-eyes) and some had flash lights. Sergeant Trahan observed the lights going back and forth from the vessel to the truck.
At approximately 3:10 a. m., after observing the off-loading operations for about six to eight minutes, Sergeant Trahan advised Lieutenant Donald Breaux of *582 the Louisiana State Police by radio that he observed bales of marijuana being off loaded from the vessel to the truck. Based on this information, at 3:15 a. m. Lieutenant Breaux gave the order for the various law enforcement officers in the area to proceed to enter the property of the Bayou Fish Company, arrest the persons off loading the marijuana and seize the illegal contraband. Immediately thereafter, he ordered State Police Officers Richard Hazelwood and Larry Le-Jeune and Customs officers Harry Benjamin, Jim Eubanks and R. C. Johnson to set up a road block just south of Golden Meadow near the Texaco Company dock to stop the ten wheel tractor and trailer which previously left the Bayou Fish Company premises. The officers then entered the property of the Bayou Fish Company and observed that the doors of the eighteen wheel tractor and trailer were opened and against the sides of the truck and through these opened doors bales of marijuana were observed. The front and rear doors of the fish house were open and a trail of marijuana residue was observed on the floor of the fish house leading from the MR. PETER to the loading dock and the trailer. There were several bales of marijuana on the deck of the MR. PETER and marijuana could be observed in the hold of this vessel through its opened hatch. When the police officers went onto the property of the Bayou Fish Company, many of the persons present attempted to flee the scene by running from the loading area. Others (at least five) jumped into Bayou Lafourche and commenced swimming. The defendant, Orestes Estrada, was arrested in the small office building immediately adjacent to the fish shed.
State Trooper Ronald Theriot was ordered to commence north of La. Hwy. 1 and identify the ten wheel tractor and trailer which previously left the premises to the police officers at the road block. The radio communications from the law enforcement agents at the Bayou Fish Company confirmed to the agents at the road block that marijuana had in fact been found on the premises prior to the time that the ten wheel tractor and trailer was stopped. When this vehicle was stopped at the road block it was being driven by Albert Kibodeaux [sic]. His wife, Bernice D. Kibodeaux [sic], was a passenger in the vehicle, Mr. and Mrs. Kibodeaux [sic] were ordered out of the vehicle. Officer Hazelwood requested and received the keys to the trailer from Mr. Kibodeaux [sic]. He gave these keys to Officer Benjamin, who then opened the lock on the rear doors of the trailer, opened same and found many bales of marijuana partially hidden behind two rows of boxes of seafood.
It is well settled that a search conducted without a warrant issued upon probable cause is per se unreasonable under the fourth amendment, subject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 93, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Spencer, 374 So.2d 1195 (La.1979); State v. Gordon, 332 So.2d 262 (La.1976). One of these exceptions is the so-called "automobile exception." This exception is based upon the existence of probable cause to search the vehicle and exigent circumstances which render it impractical to secure a warrant. Coolidge v. New Hampshire, supra; Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); State v. Spencer, supra; State v. Gordon, supra. This exception applies equally to a vessel. United States v. Weinrich, 586 F.2d 481 (5th Cir. 1978) cert. denied, Blair v. U. S., 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 and 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).
In the instant case, the officers clearly had probable cause to believe that the truck located at the Bayou Fish Company and the vessel docked at the wharf adjacent thereto and the truck which had left the premises contained contraband which they were entitled to seize. The officers *583 had received information that a smuggling transaction would be taking place in several days at the Bayou Fish Company. An immediate surveillance of the premises was set up which continued until the night in question (seven days later). On that night, all lights at the fish company were extinguished contrary to the previous evenings. Thereafter, the arrival of eleven to fourteen persons and the activity of an automobile along the highway between the draw bridge on the bayou and the fish company further aroused the officers' suspicion. Moreover, two individuals were identified who had been previously involved in a possible attempted smuggling operation. Thereafter, a shrimp boat, being towed by another shrimp boat, was observed proceeding in a northerly direction in Bayou Lafourche. The vessels docked at the wharf of the fish company. An eighteen-wheel tractor-trailer and a ten-wheel tractor-trailer were observed parked on the premises. Subsequently, Sgts. Zeringue and Trahan moved to a location under a porch of a house about one hundred feet from the fish company. Trahan testified that he observed the unloading of what appeared to be marijuana. He stated that, while looking through a night scope and with the unaided eye, he could see silhouettes of people, some using head lamps or flashlights, carrying burlap bales and traveling in a pattern from the direction of the wharf through the fish house to a loading dock and into trucks parked at the loading dock. He further stated that he could see into the fish house through an open window and door. He also stated that he could hear the sound of bales hitting the wharf and recognized the burlap bales as similar to those he had seen utilized to effect the "offloading" of marijuana from vessels during two previous investigations. Trahan testified that, while binoculars magnify what you can see, a night scope only "clarified what I was looking at with the naked eye."[5] a Trahan reported his observations to Lt. Donald Breaux who commanded the operation. Breaux immediately ordered the police officers to close in on the fish company and to stop the ten-wheeler already traveling on La. Highway 1 (a roadblock had previously been set up). The officers seized the marijuana from the eighteen-wheeler and the shrimp boat at the fish company site and the officers at the roadblock stopped the ten-wheeler on the highway and seized the marijuana contained therein. Clearly, there was probable cause to make the searches and seizures. Moreover, exigent circumstances existed since one of the trucks had already departed loaded with marijuana and defendants were in the process of unloading the marijuana from the vessel into the eighteen-wheeler. Hence, the searches and seizures were proper. State v. Dupuis, 378 So.2d 934 (La.1979); State v. Spencer, supra.
Defendants also contend that the search was unreasonable because the observations of Trahan were made while he was on another's property and with the aid of a night scope. In determining whether one has a reasonable expectation of privacy, the test is not only whether the person had an actual or subjective expectation of privacy but also whether his expectation of privacy is of the type which society at large is prepared to recognize as being reasonable. Katz v. United States, 389 U.S. 347, 83 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Dupuis, supra; State v. Wilbourn, 364 So.2d 995 (La. 1978), cert. denied, 444 U.S. 825, 100 S.Ct. 46, 62 L.Ed.2d 31 (1979). Trahan's observations were made from the property of another within one hundred feet from the fish company. Although the officer was on the property of another, defendant had no reasonable expectation of privacy on the wharf and the area immediately adjacent *584 thereto. Although it was a private dock, it was located on a public navigable waterway (Bayou Lafourche) and their actions could have been viewed by anyone passing on the waterway. Hence, we conclude that Trahan's observations of defendants from the adjoining property did not violate defendants' fourth amendment rights since defendants had no reasonable expectation of privacy under the circumstances.
We further reject defendants' contention that Trahan's use of the night scope was violative of the fourth amendment. The United States Court of Appeal, Fifth Circuit, in United States v. Grimes, 426 F.2d 706 (1970), stated:
. . . Special Investigator Griffith testified that through binoculars, he observed the appellant, a known liquor violator, placing two large cardboard boxes (each of which contained six gallons of untaxed whiskey), in a 1961 Buick. The observations were made from a field belonging to another, about 50 yards from the appellant's house. This did not constitute an illegal search. [Citations omitted.]
See also Fullbright v. United States, 392 F.2d 432 (10th Cir. 1968), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968); United States v. Minton, 488 F.2d 37 (4th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). In the instant case, we see no significant difference between binoculars that magnify and a "night scope" that clarifies the observations made by the naked eye. Hence, we conclude that Trahan's observations of defendants from an open area on property belonging to another, about one hundred feet from a private wharf located on a public navigable waterway, did not constitute an illegal search.
In sum, we conclude that the officers acted properly in searching and seizing the contraband contained in the two tractor-trailers and the shrimp boat. The trial judge did not err in denying the motion to suppress the evidence. Hence, Assignment of Error No. 1 is without merit.
Having reviewed the remaining assignments of error asserted by Delton Demere, Weylen Demere, Hamilton and Estrada, we find that they present no reversible error and do not require published explanation because they do not present any question of unsettled law. Therefore, these assignments of error are discussed in an unpublished but publicly-recorded appendix to this opinion.

DECREE
Defendants' convictions and sentences are affirmed.
WATSON, J., concurs and assigns reasons.
DENNIS, J., concurs for the reasons assigned by WATSON, J.
WATSON, Justice, concurring.
I concur in the affirmation of the convictions and sentences.
However, I do not agree with the comments in the majority opinion which approve of the reliance on observations through a nightscope to establish probable cause. As I understand this device, it not only magnifies what the viewer could see with the naked eye, but also makes possible the observation of activities which the viewer could not see because of darkness. There is little difference, therefore, between a nightscope and electronic bugging devices or telephone wire-tapping instruments. By electronic means, the investigator is able to gather evidence which could not be obtained without the use of ingenious scientific devices.
The constitution does not authorize the invasion by electronics of the reasonable expectations of privacy enjoyed by our citizens. In the present case, the evidence is that the investigating officers could see and did see sufficient with the naked eye to give them probable cause for arresting defendants.
Therefore, I concur in the result.
NOTES
[1] Cody L. Denton, Jack N. Hutchinson, James E. Callais, Eric R. Guidry, Bernice D. Kibodaux, Albert Kibodaux, David R. Johnson, Benjamin F. Kelley, Sr., Charles K. Singletary, Dennis H. Cannon, Walter C. Marshall, Larry J. Schouest, Orestes F. Estrada, Delton Demere, Weylen Demere and John D. Hamilton were charged by the grand jury in the same indictment with possession with intent to distribute marijuana in violation of La.R.S. 40:966(A). Defendants entered pleas of not guilty. All defendants except Callis and Schouest filed a motion to suppress the marijuana seized. After a hearing, the motion was denied.

Johnson and Hutchinson withdrew their former pleas of not guilty and entered guilty pleas to amended charges of possession of marijuana.
After selection of the jury on the day of trial, Denton, Marshall, Cannon, Singletary, Kelley and Guidry withdrew their former pleas of not guilty and entered pleas of guilty to amended charges of attempted possession with intent to distribute marijuana.
Albert Kibodaux withdrew his former plea of not guilty and entered a plea of guilty as charged (possession with intent to distribute marijuana).
Each of the aforesaid defendants reserved his right to appeal the ruling of the trial judge denying the motion to suppress. State v. Crosby, 338 So.2d 584 (La. 1976).
On joint motion of the state and defendant, a mistrial was declared as to Bernice D. Kibodaux and she was severed from the proceedings; subsequently, the charge against her was nolle prossed.
After trial by jury, Delton Demere, Weylen Demere, Hamilton and Estrada were found guilty as charged (possession with intent to distribute marijuana). Callais testified against them at trial. Callais and Schouest were not prosecuted.
Denton, Marshall, Cannon, Singletary and Kelley were each sentenced to serve five years at hard labor and to pay $400 of the court costs.
Guidry was sentenced to four years and three hundred and sixty-four days at hard labor and to pay $400 of the court costs.
Johnson and Hutchinson were each sentenced to serve six months in the parish jail and to pay $400 of the court costs.
Albert Kibodaux was sentenced to serve seven and one-half years at hard labor and to pay a fine of $5,000 and $2,852.02 of the court costs and in default thereof to serve an additional year consecutively with the sentence previously imposed.
Delton Demere, Weylen Demere. Hamilton and Estrada were each sentenced to serve ten years at hard labor and to pay a fine of $15,000 and $2,750 of the court costs and in default thereof to serve an additional year consecutively with the sentence previously imposed.
Denton, Marshall, Cannon, Singletary, Kelley, Guidry and Albert Kibodaux appealed their convictions and sentences only on the issue of whether the trial judge erred in denying the motion to suppress, reserved at the time the guilty pleas were entered. Delton Demere, Weylen Demere, Hamilton and Estrada appealed, relying on seven assignments of error for reversal of their convictions and sentences (No. 66,438).
We granted the application of Johnson and Hutchinson to review their convictions and sentences under our supervisory jurisdiction (No. 65,468). Since their convictions arise out of the same facts as those of the above appeals, we granted the joint motion of the state and defendants to consolidate the two cases.
[2] Bayou Fish Company is located approximately fifteen miles from the Gulf of Mexico.
[3] Surveillance revealed that the lights of the fish house were extinguished each evening at about 10:00 or 11:00 p. m., with the exception of one light inside the fish house which was left burning. On the night of August 26, 1978, however, all the lights were turned off and the fish company was in total darkness; that evening was the only night that the officers observed Bayou Fish Company to be totally dark.
[4] Police surveillance had revealed that a ten-wheel and an eighteen-wheel tractor-trailer were parked on the premises of the fish company. Sgt. Trahan testified that, although he could observe that bales of marijuana were being loaded into the trucks, he could not observe into which of the two trucks the bales were being loaded.
[5] When questioned whether he observed what was going on with his naked eye or the night scope, Sgt. Trahan replied:

Well, at some stages I looked with the naked eye; other stages I was looking through the night scope. I didn't utilize the night scope the entire six to eight minutes that I was underneath the porch. I could follow the small lights coming from behind there and going all the way through-that was real visible with the naked eye. When I utilized the night scope it was to itensify [sic] what I was looking at, and I could see individuals a lot clearer than with the naked eye.