432 So.2d 1003 (1983)
STATE of Louisiana
v.
Victor J. WILLIAMS, et al.
Nos. 82 KW 0926, 83 KW 0154.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
Writ Denied June 27, 1983.
*1004 Bernard E. Boudreaux, Jr., Dist. Atty., Walter J. Senette, Jr., Asst. Dist. Atty., Franklin, for appellee.
Allen McElroy, Jr., Berwick, for appellant.
Before COVINGTON, LANIER and ALFORD, JJ.
LANIER, Judge.
The seventeen defendants[1] in this case were charged in a bill of information with possession of marijuana in excess of 10,000 pounds in the Parish of St. Mary on April 20, 1982, in violation of La.R.S. 40:966(E)(3). The defendants filed pretrial motions to suppress all physical evidence, to suppress statements by Victor Williams, Donald Dean, Roger Goff and Raul Bonilla, to quash out-of-court identifications, to sever and for a speedy trial. The trial court granted the motions to suppress the statements made by Victor Williams to Richard Hazelwood and to Duval Arthur. The trial court determined that the motion for a speedy trial was moot and denied all other motions. The state applied to this court for supervisory writs contending that the suppression of the statements given by Victor Williams to Richard Hazelwood and to Duval Arthur was in error. The defendants applied to this court for supervisory writs contending that the physical evidence seized should be suppressed because the search was without a warrant and, therefore, illegal per se. This court denied that portion of the state's application pertaining to the statement given by Victor Williams to Richard Hazelwood because the ruling of the trial judge was correct. This court granted that portion of the state's application pertaining to the statement given by Victor Williams to Duval Arthur and others and granted the application of the defendants. In brief and in oral argument, the state has acquiesced in the trial court judgment suppressing the statement given by Victor Williams to Duval Arthur, and that ruling is no longer at issue.
This court usually will not exercise its supervisory authority to review pretrial evidentiary rulings unless the ruling is clearly wrong or there is no adequate remedy from the ruling by appeal. See, for example, State v. Singletary, 428 So.2d 965 (La.App. 1st Cir.1983). To do otherwise would encourage piecemeal litigation of criminal matters and substantially delay a final disposition of the case. The issue at the heart of this case is whether a warrantless search of a vessel, which resulted in the seizure of 27,939 pounds of marijuana, was legal. Both the state and the defendants requested that we review the pretrial evidentiary ruling on this issue. The parties correctly point out that at a joint trial of seventeen defendants for the offense charged, each side will be entitled to 204 *1005 peremptory challenges, for a total of 408. La.C.Cr.P. art. 799. Because of the number of defendants, presentation of the cases of the state and defendants will be greatly protracted. A trial of this magnitude is costly in time and resources. Because of the particular facts and circumstances of this case and because all parties requested a pretrial adjudication of this issue, we granted this writ in the interest of judicial economy.

FACTS
We have reviewed the record and find that the trial judge accurately set forth in his per curiam comments the facts as they relate to the search and seizure. Accordingly, we adopt the following statement of facts as our own:
"James White, a deputy of the St. Mary Parish Sheriff's Department, was asked by Agent Riley of that department, upon Deputy White's employment, to maintain a general surveillance of defendant Victor Williams. Agent Riley knew that Williams was known to White for many years and Riley suspected Williams' involvement in a series of thefts. White agreed.
"Sometime later, defendant Williams advised Deputy White, who was known to him to be a sheriff's deputy, that sometime soon he along with defendants Goff, Draper and Black, would be unloading marijuana coming from Columbia aboard a 90' steel shrimp boat and Williams enlisted Deputy White's aid in the venture. 45,000 pounds of marijuana were said to be involved and it was to be off loaded onto three trucks in St. Mary Parish.
"Deputy White kept in regular personal contact with defendant Williams and reported regularly to his superiors in the department.
"A site for the off loading was selected and inspected by Deputy White and defendant Williams on several occasions. Defendants Black and Goff were met on one of these inspections. Other officers observed the inspection activities.
"On another occasion White met Goff by accident and Goff inquired how White liked the smuggling business.
"Subsequently defendant Williams advised Deputy White that the boat had been delayed approximately two weeks in the Yucatan Straight (sic). He further advised that when the boat did arrive he would charter a crew boat and use it to go out and meet the boat coming from Columbia to pick up the contraband and bring it ashore.
"On April 19, 1982, defendant Williams went to Deputy White's home and gave him fifty twenty dollar bills as part of his pay off for his part in the affair and advised Deputy White that at 12:30 AM April 20th, the expected contraband, now reduced to 35,000 pounds, would arrive at the selected site aboard a 110' green and white crew boat stacked on the after deck thereof. Defendant Williams advised which radio frequencies would be used; that he would skipper the vessel; and defendants Black, Goff, Draper and others would be present to unload the contraband into three trucks said to be two eighteen wheelers and a ten wheeled van. Deputy White suspected that a boat belonging to PBR Boat Company would be used because he knew defendant Williams to be related to a PBR employee and that all PBR boats were painted green and white.
"Based upon Deputy White's information, the St. Mary Parish Sheriff's Department assembled a force of sheriff's deputies, state police, an officer of the Drug Enforcement Agency and an officer of the United States Customs Service. A command post was set up and surveillance by officers of the anticipated unloading area was established from an 18' speed boat, a tug boat, and a fifty foot high tower in the immediate area. Numerous deputies in vehicles, both marked and unmarked, were scattered about the area and all officers were in radio contact with the command post.
"It was anticipated that the deputies would permit the unloading operation to begin and would obtain a search warrant for the vessel and the three trucks that were anticipated to be involved in an effort *1006 to apprehend not only the parties directly involved but to obtain leads to others involved in the smuggling operation who were not present. Deputy Duval Arthur of the St. Mary Sheriff's Department was stationed at the St. Mary Parish Courthouse in Franklin armed with a partially completed affidavit in support of a search warrant and awaiting word from the officers on the scene as to the exact description of the vessel and of the trucks that were expected to be involved. Arrangements for a judge to be available had been made.
"At exactly 12:30 AM the motor vessel PBR 124, at 110' offshore crew boat, green and white in color, was observed by several deputies both on the tower and in the tug boat proceeding very slowly in the Intracoastal Waterway in the immediate vicinity of the anticipated unloading site. Eight to ten persons were observed on the aft deck of the boat. Officers monitoring the frequencies Williams gave White overheard what appeared to be coded messages. When the vessel approached the designated unloading area, a deep slip off the Intracoastal Waterway, it stopped and began slowly backing into the slip. Officers observed a large area of the after deck to be loaded with some form of cargo covered with black visqueen. When the boat was approximately half way into the slip it suddenly moved forward and out of the slip and into the Intracoastal Waterway. In the process of so doing, the visqueen covering the cargo on the after deck was partially lifted and the observing officers[2] could see burlap sacks stacked approximately three or four high resembling those which these experienced officers had previously seen in the other raids involving large quantities of smuggled marijuana.
"The motor vessel PBR 124 then moved off slowly to the west out of sight.
"A silver Ford pickup truck in which defendant Goff had been seen drove up to the waterfront in the immediate area and then a second vehicle drove up. Defendant Goff alighted from the first vehicle and spoke to the persons in the second vehicle who then drove off. Defendant Goff then walked down to the edge of the water at the dock facility belonging to Mar-Vac in the immediate area of the anticipated unloading area and spoke to the skipper of the motor vessel Chocktaw which was the tug boat being used by the sheriff's deputies and others for water borne surveillance in this operation and which was moored there. He inquired of the captain his reason for being present and after being advised that the Choctaw was awaiting a crew change defendant Goff reentered his vehicle and drove off.
"Thereafter officers in the tower observed the PBR 124 in the Intracoastal Waterway to the west returning slowly to the east and no cargo was visible on its after deck. This information was relayed to the command post and the officer in charge, feeling that the cargo may have been off loaded at some point along the Intracoastal Waterway, dispatched several units to see if this could be verified but these efforts were without success.
"The PBR 124 then docked along side a vessel belonging to Briley Marine which was in turn tied up to the Mar-Vac dock. This was within seventy to one hundred feet of the motor vessel Choctaw and in clear view of the officers on the tower. The PBR 124's engines were not shut down.
"At this point the silver Ford pickup truck returned to the Mar-Vac dock area. Defendant Goff alighted and walked toward the waterfront. Defendant Williams came ashore from the PBR 124, met Goff and they talked. Shortly thereafter they waived a signal toward the PBR 124 and several people came ashore from the PBR 124 carrying luggage and congregated near the pickup truck. One person was seen to take off a side arm and place it in the truck. Defendant Williams and one other person returned to the PBR 124 while the remaining persons climbed aboard the pickup truck and it departed proceeding east along Highway 90 toward Morgan City.
*1007 "Unmarked police units followed this pickup truck to the business place belonging to defendant Black where all but three persons entered two other pickup trucks and three trucks departed. Two were followed by four officers in two unmarked units. Upon orders of State Police Lieutenant Zerangue, who was in charge of that phase of the operation, officers stopped one truck in the parking area of the Morgan City Bank near the Morgan City Police Department Headquarters. All persons were removed from the truck, placed under arrest and their Miranda rights given to them.
"State Police Officer Richard Hazelwood arrived on the scene and took defendant Donald Dean aside, again advised him of his Miranda rights, and asked him what had become of the cargo on the vessel. Defendant Dean advised that the cargo was still on board; that it had come from the vessel Monte Christo which he had been aboard and which he had piloted from Columbia.
"Trooper Hazelwood chose to speak to defendant Dean at the arrest scene because Dean was known to him to have been on the PBR 124. Since Dean had come off the boat he felt certain that Dean would know what had happened to the cargo.
"Defendants Dean, Vanderpool and Marques each testified that at their arrest they were beaten and threatened by the officers and no Miranda warnings were given. All of the officers present who testified stated to the contrary. The area of the arrest is in the central business area of Morgan City in a large, well lighted, parking area adjacent to and fronting on U.S. Highway 90, a very busy street even in the early morning.
"This information concerning the cargo was radioed to the command post and the motor vessel Choctaw was then moved into position to hem the PBR 124 into the dock area to prevent its departure. It was boarded and three of the defendants Williams, Bonilla and another, were arrested leaving the PBR 124. Immediately upon boarding the PBR 124 burlap bales exactly resembling those seized in prior arrests of smugglers were clearly visible inside the lighted cabin area through an open door stacked almost to the ceiling. The decision to board PBR 124 was prompted by the fact that its engines were still running, three crew members were still aboard, and only one of the trucks containing crew members had been stopped and it was, therefore, possible that the other could have notified the crew of the arrests and the PBR 124 could have departed the area and returned to the open sea.
"At the time that the pickup truck containing the majority of the defendants was stopped, the officers had been advised that some of those who got into the truck were armed. All of the officers were either in uniform or wore jackets with State Police emblems clearly displayed. The Miranda warnings were read to all of the defendants in a group and given by Trooper Hazelwood individually to defendant Dean. There was a strong smell of marijuana on the persons in the truck.
"Deputy Swords of the St. Mary Sheriff's Department searched the truck and the luggage at that time for weapons, found a loaded 38 caliber pistol in one suitcase, unloaded it and returned it to the suitcase. No contraband was found at that time nor was any searched for. All of the individuals were patted down for weapons.
"On the 21st of April, after obtaining a search warrant, and pursuant thereto, the truck and the luggage were searched and contraband was found in the form of marijuana in the luggage of two of the defendants (Bonilla and Wobst) and the previously described handgun. Items in the luggage identified its owners before defendants were asked to claim their possessions.

....
"Three persons, including defendant Bonilla, were arrested while fleeing from PBR 124 and held on the stern of the Briley Marine vessel. Trooper Harrison read their Miranda rights to them and since Bonilla appeared to be Spanish asked him in Spanish if he understood the rights which had been read. Bonilla replied in Spanish that he did. All three were then asked if any weapons were on board and Bonilla, using *1008 gestures, pointed out the location of a handgun between burlap bagged bales inside the crew quarters of PBR 124. The gun was retrieved from the indicated location by one of the officers."

WARRANTLESS SEARCH OF VESSEL
The law applicable in the instant case is succinctly set forth in State v. Denton, 387 So.2d 578, 582 (La.1980), as follows:
It is well settled that a search conducted without a warrant issued upon probable cause is per se unreasonable under the fourth amendment, subject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 93 [218] 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Spencer, 374 So.2d 1195 (La.1979); State v. Gordon, 332 So.2d 262 (La.1976). One of these exceptions is the so-called "automobile exception." This exception is based upon the existence of probable cause to search the vehicle and exigent circumstances which render it impractical to secure a warrant. Coolidge v. New Hampshire, supra; Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); State v. Spencer, supra; State v. Gordon, supra. This exception applied equally to a vessel. United States v. Weinrich, 586 F.2d 481 (5th Cir.1978) cert. denied, Blair v. U.S., 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 and 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

PROBABLE CAUSE
Probable cause to search exists when the facts and circumstances are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. State v. Huffman, 419 So.2d 458 (La.1982); State v. Wichers, 392 So.2d 419 (La.1980).
The information developed by the undercover police officer,[3] James White, indicated that on April 20, 1982, at approximately 12:30 A.M., a green and white crew boat would arrive at the A-Z Terminal near the Amelia community in St. Mary Parish, Louisiana, carrying 35,000 pounds of marijuana. The marijuana would be stacked on the afterdeck of the vessel. The persons responsible for bringing in the marijuana would be using a special radio frequency to communicate with each other in code. Paul Black, Roger Goff and Max Draper would be present in the area. Victor Williams would be captain of the vessel. The marijuana would be off-loaded into two eighteen-wheeled vehicles and one ten-wheeled vehicle.
Observations by the police officers at the scene confirmed that on April 20, 1982, at approximately 12:30 A.M., a green and white crew boat arrived at a boat slip at the A-Z Terminal near the Amelia community in St. Mary Parish, Louisiana. Eight to ten persons were observed on the vessel. A special radio frequency was being used by persons to communicate, apparently in code. A large amount of cargo was located on the afterdeck of the vessel. As the crew boat was backing into the boat slip at the A-Z Terminal, it suddenly moved forward and the visqueen covering the cargo on the afterdeck was partially lifted and Inspector Bobby L. Froreich observed brown burlap sacks stacked three or four high. Inspector Froreich had been involved in six previous arrests totaling over 100 tons of marijuana and the bales of marijuana in those cases were similar in size, configuration and wrapping to those on the crew boat. At this point in time, reasonable suspicion matured into probable cause. State v. Casillas, 393 So.2d 694, 695-696 (La.1981); Denton, 387 So.2d at 583; State v. Dupuis, 378 So.2d 934, 937-938 (La.1979); State v. Spencer, 374 So.2d 1195, 1198-1199 (La.1979). Subsequently, Roger Goff arrived at the scene and Victor Williams disembarked from the crew boat.
*1009 The defendants contend that the arrest of Donald Dean in the vehicle in Morgan City, Louisiana, was without probable cause and thus illegal. They further assert that the confession given shortly after the arrest by Dean to Trooper Richard Hazelwood was the product of this unlawful arrest and thus tainted by the primary illegality.[4] The defendants then assert that since the warrantless search of the crew boat was based on the statement of Dean that the marijuana was inside the crew boat, the warrantless search was invalid. The defendants further contend that since the crew boat left the A-Z Terminal boat slip at 12:30 A.M. and did not return to an adjoining slip until 1:15 or 1:20 A.M., that there was no evidence that the crew members leaving the vessel at 1:20 A.M. were the same crew members who were observed on the vessel at 12:30 A.M.
A peace officer may arrest a person without a warrant when the person to be arrested has committed an offense in his presence, when the person to be arrested has committed a felony (although not in the presence of the officer) or when the peace officer has reasonable cause to believe that the person to be arrested has committed an offense. La.C.Cr.P. art. 213(1), (2) and (3). Reasonable or probable cause to arrest has been defined in State v. Latin, 412 So.2d 1357, 1360 (La.1982), as follows:
"Reasonable cause which under Louisiana Code of Criminal Procedure Article 213 is consonant with the probable cause concept, exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime; `probable cause' may be judged by the probabilities and practical considerations of every day life on which average men, and particularly, average police officers, can be expected to act." State v. Drew, 360 So.2d 500 (La. 1978) cert. den. 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1978).
See also State v. Commodore, 418 So.2d 1330 (La.1982); State v. Tokman, 412 So.2d 561 (La.1982). When Inspector Froreich observed the characteristic brown burlap bales on the afterdeck of the crew boat in the slip at the A-Z Terminal, suspicion also matured into probable cause to arrest those persons who were aboard the vessel. After the crew boat left the slip, it proceeded in a westerly direction in the Intracoastal Canal for a distance of approximately one-half mile. Inspector Froreich observed the boat as it was performing this maneuver for an indeterminate period of time. The batteries in Froreich's radio needed changing so he came down from his tower and changed them. He then went back up into the tower and observed the return of the crew boat from approximately 1:15 to 1:20 A.M. During a part of the time, Inspector Froreich was unable to see the vessel because of obstructions. When Inspector Froreich lost visual contact with the vessel, Lieutenant Mark Zerangue of the Louisiana State Police dispatched an unmarked unit to check the roadway and banks of the canal between the A-Z Terminal and the place where the vessel was last seen. This inspection failed to reveal any unloading operations, any trucks for unloading operations, any bales of marijuana or any persons. When the vessel returned at approximately 1:15-1:20 A.M., it had approximately the same number of persons aboard as when it was last observed. Under these circumstances, the police officers could reasonably believe that the persons who left the vessel were the same as those previously observed and that the contraband was still aboard the vessel. Police officers remained in constant visual contact with Dean and the persons who were arrested with him from the time that they left the vessel until the time of arrest. Under all of these circumstances, the police officers had reasonably trustworthy information sufficient *1010 to justify a man of ordinary caution in believing that a crime involving a large amount of marijuana had been committed and that Dean was one of the persons involved in that crime. Even if Dean's statement was illegally obtained, it is not essential to the establishment of probable cause because the police had probable cause to search and arrest when the characteristic features of the bales of marijuana were observed on the afterdeck of the vessel. Thus, the defendants argument fails on two grounds: (1) the arrest of Dean was with probable cause and legal; and (2) even if the arrest of Dean was not legal, his statement to Trooper Hazelwood is not essential to the establishment of probable cause because the probable cause matured prior to the time that the statement was taken.

EXIGENT CIRCUMSTANCES
The trial judge correctly concluded that exigent circumstances existed to authorize the warrantless search. The engines of the crew boat were running and three crew members were aboard. Most of the persons aboard the vessel had disembarked and were leaving the area. State v. Cunningham, 412 So.2d 1329 (La.1982); Denton, 387 So.2d at 583; Dupuis, 378 So.2d at 938; Spencer, 374 So.2d at 1199.
Although there was a delay between the time that probable cause matured and the time that the vessel was searched, such delay does not affect the validity of the search. Under the particular facts of this case, the delay was reasonable. The vessel left its original intended mooring site before docking and went up and down the Intracoastal Canal. The trucks to be used in off-loading the vessel did not arrive. Good police practice often requires postponing action, even after probable cause arises, to develop further evidence to prove guilt.[5] The record does not reflect that the police officers deliberately extended the surveillance to circumvent the necessity for a warrant or for any other improper motive. Cunningham, 412 So.2d at 1332; State v. Littleton, 407 So.2d 1208, 1212-1213 (La. 1981); State v. Tant, 287 So.2d 458, 460-461 (La.1973); United States v. Weinrich, 586 F.2d 481, 492-494 (5th Cir.1978).

CONCLUSION
For the foregoing reasons, the judgment of the trial court that the warrantless search of the vessel and seizure of the marijuana was legal is correct, and is affirmed.
AFFIRMED.
NOTES
[1] Paul Black, Raul Bonilla, Donald Dean, Max Draper, John H. Farmer, Ronald C. Ferqueron, Kevin D. Gaide, Roger S. Goff, David M. LaClare, Jamie B. Marques, Jr., James G. Maslanka, Arseceo Orosco, Ron R. Polaczyk, Pedro A. Ramirez, William T. Vanderpool, Victor Williams and Wotan A. Wobst.
[2] Inspector Froreich testified without objection that Trooper Pat Olivier was also on the tower with him and observed the brown burlap bags.
[3] White was not a confidential informant.
[4] In brief the defendants assume arguendo that Dean was properly advised of his Miranda rights.
[5] In the instant case, it may have been better police procedure to wait for the anticipated arrival of the three trucks so that all persons connected with this course of conduct (including stevedores and truck drivers) could be identified and arrested and all vehicles seized. However, further delay could have impeded the ability of the police to arrest those who had already left the vessel.