**UNITED STATES of America, Appellee,**

v.

**Robert ROSE, Sr., Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**James HILL, Defendant, Appellant.**

**Nos. 81-1140, 81-1258.**

United States Court of Appeals,
First Circuit.

Argued Nov. 4, 1981.

Decided Jan. 27, 1982.

As Amended March 15, 1982.

John Wall and Nancy Gertner, Boston, Mass., with whom Ronald Kovner, Washington, D. C., Cullen & Wall, Harvey A. Silverglate, and Silverglate & Gertner, Boston, Mass., were on joint brief, for defendants, appellants.

John H. LaChance, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, DAVIS,* Judge, BREYER, Circuit Judge.

COFFIN, Chief Judge.

Appellants James Hill and Robert Rose seek reversal of their convictions for possession with intent to distribute marijuana and for conspiring to import and distribute marijuana. 21 U.S.C. §§ 952, 955a, 960, 963; 18 U.S.C. § 2.

On October 29, 1981, an employee in the monitoring branch of the enforcement division of the Federal Communications Commission (FCC) intercepted what appeared to him to be a suspicious radio transmission. It was a point-to-point communication transmitted on the "ham" radio operator's band, but contrary to FCC regulations

* Of the U. S. Court of Claims, sitting by designation.

which limit that band to transmissions on land, it seemed to originate from and be sent to points off the Atlantic coast. Although the FCC confirmed within an hour that the transmission was from a marine source, the employee did not institute actions to rectify the violation of the regulations but instead continued to listen and take notes. He had concluded that the transmissions referred to contraband trafficking.

After five hours of overhearing, FCC officials turned the information accumulated through the interception over to the United States Coast Guard which, after listening further, directed one of its cutters to the location of the suspected "drop site". As the cutter approached in the dark on the night of October 30, it saw two vessels side by side, apparently transferring bales of marijuana from one to the other. Upon hearing the Coast Guard's announcement of its presence, the people on board the boats started throwing bales overboard. When the Coast Guard boarded after seeing bales on the ships, it arrested twelve Americans and ten Colombian nationals.

Two days after the arrest, the government turned one of the Colombians, Edgar Danies-Ocampo, Jr., over to the Immigration and Naturalization Service for deportation, a deportation that occurred with more haste than usual. The government pointed to Danies-Ocampo's status as a 17-year-old minor to justify its decision to drop charges and instigate deportation proceedings.

Appellants argue that the trial court should have granted their pre-trial motion for suppression of the marijuana because the interception by the FCC, its decision to turn the information obtained by interception over to the Coast Guard, and the Coast Guard's subsequent interception violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.*, the federal wiretapping statute. In addition, they appeal the trial court's denial of their motion to dismiss the indictment. They had moved to dismiss on the grounds that the government's decision to deport Danies-Ocampo without notice to appellants

violated their rights to compulsory process and due process because it denied them the opportunity to interview the only individual who witnessed the events, was not indicted, and had not agreed to be a witness for the government.

▮ In ruling on appellants' claim that the interception of the point-to-point transmissions violated Title III and therefore required suppression of the marijuana seized as a result, the threshold and, in this instance, the determinative issue is whether the communications intercepted come within the protection of the Act. Although Title III establishes extensive restrictions on the interception of communications, it applies only to those communications deemed to be either "wire" or "oral" communications. *See* 18 U.S.C. § 2511. Obviously not a wire communication, a point-to-point radio transmission is protected only if it falls within the definition of oral communication—"any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such exception", 18 U.S.C. § 2510(2). This definition has been interpreted to require that the speaker have a subjective expectation of privacy that is objectively reasonable. *See Holman v. Central Arkansas Broadcasting Co.*, 610 F.2d 542, 544–45 & n.3 (8th Cir. 1979); *United States v. Pui Kan Lam*, 483 F.2d 1202, 1206 (2d Cir. 1973), *cert. denied*, 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974); *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978); S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News 2112, 2178.

The trial court, trying the case without a jury, found that appellants had neither a subjective expectation of privacy nor a reasonable objective expectation. Applying the clearly erroneous standard of review, as we must when a determination of fact such as this is appealed, *United States v. Hall*, 488 F.2d 193, 198 (9th Cir. 1973), we cannot find that the trial court erred. The manner in which the communications were transmitted indicates that appellants were aware that their communications were likely to be

intercepted. They switched frequencies during the course of their transmissions; they did not identify the stations they were operating as required by the FCC; they did not identify themselves; and lastly, they chose to use code from time to time to disguise the content of their communications. This combination of factors is more than adequate to allow us to uphold the trial court's finding that appellants could not have a genuine subjective expectation of privacy. Appellants make the obvious argument that the very extent of the precautions taken by them to hide their identity and message denotes their subjective expectation of privacy. But so to conclude would confuse expectation and hope. Faced with the only available, rather exposed means of communication, appellants chose to take precautions because they did not expect privacy but hoped for the best.

Even if the subjective expectation had been proven, that expectation would not have been reasonable when judged by an objective standard. Appellants were broadcasting on the ham radio frequency, commonly known to be a means of communication to which large numbers of people have access as receivers. A reasonable person would not expect that words uttered over the ham radio frequency would be heard only by those few individuals for whom the communication was specifically intended. *See United States v. Sugden*, 226 F.2d 281, 286 (9th Cir. 1955) (dictum), *aff'd*, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449 (1956). Although we acknowledge that circumstances justifying an expectation of perfect privacy are not necessary for protection to attach, *see Lee v. Florida*, 392 U.S. 378, 381 n.5, 88 S.Ct. 2096, 2098 n.5, 20 L.Ed.2d 1166 (1968), the objective expectation of privacy in these circumstances is too minimal to deserve recognition.

■ The fact that Title III has a provision specifically allowing FCC employees to monitor communications in the normal course of their employment, 18 U.S.C. § 2511(2)(b), does not change our finding that the transmissions at issue were not communications falling within the scope of Title III. Although appellants argue that this exception for FCC employees creates the expectation that FCC officials will not monitor communications in other instances, this reasoning approaches the problem from the wrong direction. Only if the communication is one that exhibits the required expectations of privacy does the exception for FCC employees come into play. That exception cannot create an expectation that then affects the scope of the coverage of Title III.

Nor does the existence of an independent statutory provision regulating the divulgence of the contents of radio communications, 47 U.S.C. § 605, alter our conclusion. Prior to the passage of Title III, two-way radio communications were protected from interception or disclosure under § 605 regardless of the ease with which others could monitor the transmissions or any expectation of privacy. *United States v. Sugden, supra*, 226 F.2d at 286; *United States v. Laughlin*, 226 F.Supp. 112, 114 (D.D.C.1964). When Congress passed Title III, however, it simultaneously amended § 605 to state that § 605 does not apply to communications that may be intercepted and disclosed under Title III by prefacing § 605's prohibition against disclosure with the words "[e]xcept as authorized by [Title III]". Appellants argue that the amendment was not intended to reduce the degree of protection that radio communications had previously enjoyed and that therefore individuals may continue to operate two-way radios with an expectation of privacy even if their transmissions may be easily overheard.

Although Congress did not explicitly recognize that the amendment would allow the interception and disclosure of radio communications previously protected, the legislative history states clearly that "The regulation of the interception of wire or oral communications in the future is to be governed by the proposed new [Title III]". S.Rep.No.1097, [1968] U.S.Code Cong. & Admin.News, *supra*, at 2196; *see United States v. Clegg*, 509 F.2d 605, 611 n.10 (5th Cir. 1975). Moreover, the statutory mandate contained in "except as authorized by

[Title III]" cannot be avoided. We recognize that the protective shield of § 605 is significantly diminished in scope by incorporating the requirements of subjective and reasonable expectations of privacy and procedural protections set forth in Title III. *Cf. United States v. Hall, supra,* 488 F.2d at 195 n.3. On the other hand, we can see no justification for affording, as appellants would have us do, greater protection to radio broadcasts made recklessly or desperately with no realistic expectation of privacy than to face-to-face conversations that do not happen to satisfy the definition of an "oral communication" protected under Title III.

Given our conclusions that the intercepted communications were transmitted with neither a subjective nor a reasonable objective expectation of privacy, we affirm the denial of appellants' motion to suppress the evidence.**

■ Appellants also assert that the government's deportation of Edgar Danies-Ocampo without giving appellants an opportunity to determine whether he would be a useful witness violated their rights to due process and compulsory process. On the same day that the government decided not to seek an indictment against Danies-Ocampo because he was a juvenile, it turned him over to Immigration and Naturalization Service authorities who immediately took him to New York. The trial court denied appellants' motion to dismiss the indictment, finding that the deportation had not caused appellants any prejudice because other witnesses existed who could offer similar accounts. Upon reconsideration of the denial, the court added that it was satisfied that the government had ordered deportation only because Danies-Ocampo was a juvenile. As a juvenile, he would have been prosecuted separately and subject to specialized procedural requirements.

Other courts have recognized that deportation of a potential witness can constitute a violation of due process and compulsory process that requires dismissal. *See generally United States v. Valenzuela-Bernal,* 647 F.2d 72 (9th Cir.), *cert. granted,* —— U.S. ——, 102 S.Ct. 501, 70 L.Ed.2d 377; *United States v. Avila-Dominques,* 610 F.2d 1266 (5th Cir. 1980); *United States v. Calzada,* 579 F.2d 1358 (7th Cir.) *cert. dismissed,* 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978); *United States v. Mendez-Rodriguez,* 450 F.2d 1 (9th Cir. 1971). This case, however, does not present the situation where a constitutional violation has occurred. The Ninth Circuit, which first recognized that prosecutors should not be allowed to deport witnesses without allowing the other party access to the witness, explained that "[t]he thrust of [this rule] is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant". *United States v. Tsutagawa,* 500 F.2d 420, 423 (9th Cir. 1974). In this instance there is no indication that the government based its decision to deport Danies-Ocampo on an assessment of his value as a witness. The decision stemmed from the desire to return promptly to his own country a seventeen year old youth, without questioning or prosecution. The youth was one of twelve persons apprehended on a vessel other than that carrying appellants; the others were held for prosecution. On this record there is no suggestion that the government was motivated by any assessment of the usefulness of the youth as a witness to either side. Although we recognize that purity of the government's motive may not be a sufficient response to a claimed deprivation of testimony of a deported witness and that a defendant may not be required to make a detailed offer of proof, we think that a defendant must at least show that the

---

** Because we find that the intercepted communications do not fall within the protection of Title III, we need not review the trial court's assumedly alternative findings that the FCC employee acted within the scope of the statutory exception allowing FCC employees to monitor communications in the normal course of their duties and that he could convey the intercepted information to the Coast Guard.

deported witness would have been likely to offer meaningful evidence not obtainable from other available witnesses. *See United States v. Avila-Dominquez*, 610 F.2d 1266, 1270 (5th Cir. 1980) ("some suggestion . . . as to how the deported witnesses might advance the cause of revealing the truth"). The trial court was justified in finding inadequate appellants' generalized argument that Danies-Ocampo's absence was prejudicial because he was one of only two witnesses present when the events occurred but not under indictment, and the only one of those two who had not agreed to cooperate with the government. Counsel's more specific speculations at argument, even if timely, were not persuasive.

*Affirmed.*