UNITED STATES of America,
Plaintiff-Appellee,

v.

Albert Portugal SANCHEZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Jimmy Dean NOLAN,
Defendant-Appellant.

Nos. 86–1305, 86–1351.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1987.

Decided Oct. 1, 1987.

Pamela Jole Franks, Phoenix, Ariz., for defendant-appellant Sanchez.

Walter B. Nash, III, Tucson, Ariz., for defendant-appellant Nolan.

Stanley L. Patchell, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Appeal from the United States District Court for the District of Arizona.

Before SCHROEDER and POOLE, Circuit Judges, and STEPHENS,* District Judge.

POOLE, Circuit Judge:

Appellants Albert Sanchez and Jimmy Nolen challenge their convictions for possession with intent to distribute marijuana and conspiracy to distribute marijuana on the basis that evidence obtained through the use of a forward looking infrared device (FLIR) was improperly admitted at their trial. We affirm.

### FACTS

On November 1, 1984, at 6:00 p.m., U.S. Customs pilot James McCawley took off from Davis-Monthan Air Force Base near Tucson, Arizona, in a twin engine Cessna Citation jet equipped with a FLIR. He was accompanied by a FLIR operator.

McCawley was following an unidentified single engine Cessna Highwind which was traveling north towards Casa Grande, Ari-

---

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

zona. He could make out the other plane visually until it turned off its lights and made a 180-degree turn. McCawley and the FLIR operator lost contact with the plane for about 10 to 15 minutes, but the plane was being tracked simultaneously by Phoenix Sky Harbor Airport Radar, which directed the Customs officers back into FLIR contact with the plane just as it was landing.

After the plane landed, McCawley circled overhead at an elevation of 5,000 feet for about 10 minutes. He could see nothing with his own eyes; with the use of the FLIR, however, he watched as the plane landed and a pickup pulled up alongside it. He could see movement around the pickup and plane. When the plane started to move again, he followed it with the FLIR and saw the pickup turn on its lights and move down the airstrip. He also saw a Customs helicopter (which had just arrived at the scene) train a spotlight on the pickup. McCawley followed the unidentified plane after it took off until it flew into Mexico.

The pilot of the Customs helicopter had flown over the landing strip area once at about 200 feet, but couldn't see anything, because it was very dark. As he flew over the area a second time, the pickup's lights came on. He then followed the pickup with his spotlight until it stopped. He never saw the unidentified plane.

When a Customs agent approached the pickup on the ground, he found Nolen in the driver's seat and Sanchez standing behind the pickup. Sanchez and Nolen were secured in the back of the pickup and taken back to the landing strip. A red gas can was found 50 or 60 feet back in the direction from which the pickup had come. On the landing strip 47 bags of marijuana and three more gas cans were found.

Sanchez and Nolen were then arrested. A receipt for the Arizona Motel in Casa Grande, Arizona, was found in the pickup. Nolen had registered at the motel under his own name, for two persons, on November 1, 1984. Further investigation of the landing strip revealed a truck, registered to Nolen, stuck in the wash near the landing strip.

Sanchez and Nolen were each charged with one count of possession with intent to distribute marijuana and one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. At trial, the theory of the defense was that Sanchez and Nolen were in the area of the landing strip to dig out the other truck that was found stuck in the wash. The only evidence linking Sanchez and Nolen to the unidentified plane came from McCawley, and was obtained through the use of the FLIR. The defendants objected to the admission of any evidence obtained through use of the FLIR, arguing that the government had not laid a sufficient foundation for its admission. The district court overruled the defendants' objections and admitted the evidence.

The jury found the defendants guilty as charged. Sanchez was sentenced to concurrent sentences of three years imprisonment on each count, and fined $3,000. Nolen was sentenced to concurrent sentences of five years imprisonment on each count, and fined $3,000. Both timely appealed.

## STANDARD OF REVIEW

Sanchez and Nolen argue that the trial court erred in admitting evidence obtained through the use of the FLIR because the government had failed to lay a proper foundation for the evidence. A district court's decision to admit or exclude evidence will be upheld on appeal unless the court abused its discretion. *United States v. Merrill,* 746 F.2d 458, 465 (9th Cir.1984), *cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985).

## DISCUSSION

In *United States v. Kilgus,* 571 F.2d 508 (9th Cir.1978), we held that a forward looking infrared device was not sufficiently reliable and accepted in the scientific community to be used for the *unique* identification of remote objects, for example, to distinguish one DC-3 aircraft from another DC-3 aircraft. At the same time, however, we stated that "[t]here is no question that

the FLIR can be used for *generic* identification of objects, i.e., that it can readily be used to distinguish between a plane and a boat, or even between a Lear jet and a DC–3." *Id.* at 509. We explicitly cautioned in *Kilgus* that

[t]his opinion should not be interpreted in such a fashion as to necessarily preclude the use of FLIR in all situations. *Assuming a proper foundation as to reliability of generic identification and of the expertise of the operator,* FLIR identification may have significant probative value even though only generic when considered together with other admissible evidence concerning an identification. For example only, where there is continuous FLIR surveillance (no other visual contact) from a nighttime aerial intercept to a nighttime ground intercept and there is a disputed issue as to the crossing of a state boundary or international border.

*Id.* at 510 n. 2 (emphasis added). Our question here is whether the testimony adduced at trial laid a "proper foundation as to reliability of generic identification and of the expertise of the operator." We find that it did.

At trial, pilot McCawley testified as to the operation of the FLIR. He stated that it is a device used to see heat-emitting objects both on the ground and in the air. A sphere containing the FLIR camera hangs below the plane and can be rotated by the FLIR operator to point the camera. The FLIR interprets heat emissions, converting them to pictures on a screen which are identical to black and white TV pictures. The pilot has his own small FLIR screen that is about 5 to 6 inches square, and the FLIR operator has a larger screen. The FLIR operator and the pilot of the plane are in constant communication, with the operator telling the pilot where to fly and the pilot telling the operator where to point the camera. The radar and the FLIR are linked, so that the radar of the plane indicates the direction in which the FLIR is pointing.

With respect to identification of generic objects, McCawley testified that "[a]s far as identifying an aircraft, you can see that

that aircraft is out there," and maintained that, at close range, the type of aircraft could be identified.

McCawley also testified that he had about 1500 hours of experience as a pilot in a FLIR-equipped plane, and that, in his opinion, the FLIR was not malfunctioning on November 1, 1984. He admitted, however, that he knew nothing about FLIR maintenance, and was not an expert in how the FLIR worked.

■ Sanchez and Nolen urge that this testimony was insufficient to lay a proper foundation for introduction of the evidence obtained through use of the FLIR. They first argue that expert testimony should have been presented to establish that the FLIR was a generally accepted technique in the scientific community for the generic identification of objects. *See Kilgus,* 571 F.2d at 510. McCawley's testimony has satisfied this requirement, however. Although not a scientist, McCawley was a pilot experienced in working with the FLIR. He described the basic principles upon which the FLIR operated, and explained that it could identify generic objects. In light of this testimony, the district court did not abuse its discretion in admitting the FLIR evidence, particularly since appellants do not argue that the FLIR is *not* an accepted technique for the identification of generic objects.

■ Appellants also contend there was no testimony that the FLIR was functioning properly, or that the FLIR operator was properly had the required training and expertise. Again, we find that the district court did not abuse its discretion on these bases. McCawley testified that the FLIR appeared to be functioning properly on the night of November 1, 1984. Although McCawley admitted he knew nothing about FLIR maintenance, he did have significant experience as a pilot in a FLIR-equipped plane. Moreover, the FLIR operator's expertise was established by the fact that he was able to track the unidentified plane, losing it only briefly when it executed a 180-degree turn.

Further, we note that, because McCawley assisted with the operation of the FLIR

as pilot, and since the evidence introduced in this case was based on what he saw with the aid of the FLIR, the testimony introduced as to *McCawley's* expertise was adequate to lay a proper foundation for admission of the FLIR evidence.

## CONCLUSION

Because it is clear that the trial judge did not abuse his discretion in admitting the FLIR evidence, the judgment of the district court is **AFFIRMED.**